United States District Court
Southern District of Texas
**ENTERED**
February 26, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| MARIA GOMEZ, ET AL., | § § | |
| Plaintiffs. | § § | |
| VS. | § § | CIVIL ACTION NO. 3:18–CV–00348 |
| STEPHEN MASSEY, | § § | |
| Defendant. | § § | |

## MEMORANDUM AND RECOMMENDATION

This lawsuit arises from the tragic death of Alvaro Herrera ("Herrera"), who was shot and killed by League City Police Sergeant Stephen Massey ("Sgt. Massey") in January 2017 during an arrest. Herrera's parents ("Plaintiffs") have brought excessive force claims against Sgt. Massey. Pending before me is Defendant's Opposed Motion for Summary Judgment ("Motion for Summary Judgment"), which contends Plaintiffs' claims are barred by the long-standing qualified immunity doctrine. *See* Dkt. 42. After considering the Motion for Summary Judgment, the relevant authorities, and the record, I recommend that the Motion for Summary Judgment be **GRANTED** and this case be **DISMISSED**.

### BACKGROUND

On January 21, 2017, at approximately 5:20 p.m., Sgt. Massey was on duty when he received a report of an attempted robbery at a CVS pharmacy. A police dispatcher reported that a male suspect allegedly struck a woman on the head with a metal pipe when she refused to hand over her car keys. The assailant—described as Hispanic, 16 to 20 years

of age, with dark hair and dressed in a plaid shirt and blue jeans—fled on foot from the scene. Thinking that the suspect might try to blend in with construction workers building homes nearby, Sgt. Massey drove his patrol car to that area to look around.

Sgt. Massey soon observed, standing in the middle of the street, a Hispanic male with dark hair in his late teens, wearing a plaid button-up shirt and muddy blue jeans. The individual, later identified as Herrera, was within a half mile of the CVS where the alleged assault occurred. He perfectly matched the description of the person who attacked the female victim minutes earlier at the CVS.

Sgt. Massey parked his police vehicle and approached Herrera on foot, asking him what he was doing in the area. To ensure any interactions with Herrera were captured on the video camera located inside the vehicle, Sgt. Massey asked Herrera to walk to the front of the police car. There, a video recording captured the dealings between Sgt. Massey and Herrera in living color.

Since (i) Herrera matched the description of the individual who committed the attack at CVS; (ii) Herrera was found in close proximity to the crime scene within a few minutes of the crime occurring; (iii) mud on Herrera's jeans suggested that he had walked through a muddy area like that between the CVS and the location where Sgt. Massey found Herrera; and (iv) there was no apparent explanation for Herrera's presence in the area where he was found, Sgt. Massey believed probable cause existed to arrest Herrera.

At the front of the police vehicle, Sgt. Massey took hold of Herrera's arms and put them behind Herrera's back so handcuffs could be applied. Before Sgt. Massey could place handcuffs on Herrera, Herrera violently turned and assaulted Sgt. Massey. The video

2

clearly shows Herrera pulling his right hand out of Sgt. Massey's grasp, raising his hand above his head, striking Sgt. Massey's neck, and then wrapping his right arm around Massey's neck. As Herrera and Sgt. Massey struggled to gain control, they fell to the ground.

On the ground, the two men continued to fight as Herrera resisted Sgt. Massey's attempts to handcuff him. Herrera then grabbed and pulled at Sgt. Massey's gun, which was located in a holster on Sgt. Massey's right hip. Sgt. Massey screamed out "got my gun" to verbalize that Herrera was attempting to take his weapon. To prevent Herrera from gaining control of the gun, Sgt. Massey had to commit his right hand exclusively to keeping the gun holstered. This restricted Sgt. Massey's ability to defend himself. In the heat of the moment, believing it was necessary to do something to protect himself, Sgt. Massey used his left hand to acquire a knife from his belt and used it to stab Herrera's right shoulder blade area. This caused Herrera to release his grasp on the gun. As soon as he did so, Sgt. Massey threw the knife down on the ground so he could use both hands to turn Herrera on his stomach and handcuff him.

As Sgt. Massey was attempting to turn Herrera onto his stomach, Herrera picked up the knife from the street and armed himself with the deadly weapon. Fearing for his life, Sgt. Massey physically struggled with Herrera to avoid getting stabbed. With fatigue setting in, Sgt. Massey explains what happened next:

> I believed I was in mortal danger so I removed my handgun from its holster and I shot Herrera. After I fired the first shot, I tried to quickly move away from Herrera but he came toward me still holding the knife so I shot him two more times to stop him from injuring me with the knife. Those two

3

shots were necessary because the first shot did not stop the serious threat Herrera posed to my life.

Dkt. 42-2 at 7. This entire physical encounter lasted approximately 40 seconds. In justifying his actions, Sgt. Massey notes: "I took actions I believed were necessary to protect my life. . . . I used force against Herrera only because the type and amount of force I used was necessary under the circumstances to detain and arrest Herrera and to protect my personal safety." *Id.* at 9–10;

Herrera died as a result of the gunshot wounds. This lawsuit followed.

## THE QUALIFIED IMMUNITY DOCTRINE

To begin, let me provide a brief discussion about the history and the purpose of the qualified immunity doctrine. As every law student learns, 28 U.S.C. § 1983 ("Section 1983") provides individuals who have been deprived of their constitutional rights through the misconduct of state officials a civil action for damages in federal courts. Although passed in 1871, the statute was relatively obscure until the Supreme Court, in its seminal decision in *Monroe v. Pape*, 365 U.S. 167 (1961), cleared the way for Section 1983 to be used to sue state officials who violated an individual's constitutional rights. As the number of Section 1983 cases exploded during the 1960s, it became clear that there existed an inherent tension between trying to provide a remedy for constitutional violations and the dynamics of governmental operations. Although "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees[,] . . . it cannot be disputed seriously that claims frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but society as a whole." *Harlow v. Fitzgerald*, 457 U.S.

4

800, 814 (1982). "These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Id.* There is also "the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible [public officials] in the unflinching discharge of their duties." *Id.* (internal quotation marks and citation omitted). "[T]o shield [public officers] from undue interference with their duties and from potentially disabling threats of liability," the Supreme Court created the qualified immunity doctrine. *Id.* at 806.

A government officer is entitled to the defense of qualified immunity unless his or her conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

As the Fifth Circuit observed just last year:

> The qualified immunity inquiry includes two parts. In the first [a district court must] ask whether the officer's alleged conduct has violated a federal right; in the second [the district court must] ask whether the right in question was "clearly established" at the time of the alleged violation, such that the officer was on notice of the unlawfulness of his or her conduct. The officer is entitled to qualified immunity if there is no violation, or if the conduct did not violate law clearly established at the time.

*Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019). With this basic understanding of the qualified immunity doctrine in mind, I now turn to the well-tread summary judgment standard.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's claim. Put another way, "[s]ummary judgment is proper when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Coleman v. United States*, 912 F.3d 824, 828 (5th Cir. 2019). A fact issue is material "only if its resolution could affect the outcome of the action." *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 877 (5th Cir. 2003) (internal quotation marks and citation omitted). When deciding whether a fact issue exists, I must review the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. *See Bourne v. Gunnels*, 921 F.3d 484, 492 (5th Cir. 2019). "[A] good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016) (quotation omitted).

## OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

Before I go any further, I must address some objections Plaintiffs have made to Sgt. Massey's summary judgment evidence. Attached to Sgt. Massey's summary judgment papers are 18 exhibits. These include, among other things, a video recording of the attempted arrest, Sgt. Massey's declaration, various witness statements, an expert report,

interrogatories, and a toxicology report. Plaintiffs lodge blanket objections to virtually every exhibit, claiming that they are irrelevant, prejudicial, and contain hearsay. To put it mildly, I am not a fan of this shotgun approach and am not persuaded as to the merits of many of these objections. That being said, my holding on the Motion for Summary Judgment is based solely on two exhibits propounded by Sgt. Massey: (1) Sgt. Massey's declaration and attachments marked as Exhibit 2; and (2) the video recording of the incident marked as Exhibit 4. To be perfectly clear, I am not considering any of the other 16 exhibits attached to the Motion for Summary Judgment.

Plaintiffs do not object to the admissibility of the video recording (Exhibit 4), but do claim that Sgt. Massey's declaration (Exhibit 2) should be disregarded because it is "Self-serving, Hearsay, Incomplete, Unauthenticated." Dkt. 54 at 3. These objections are completely frivolous. I will explain why.

> **Self-Serving**: To start, "[a] party's own testimony is often 'self-serving,' but [a court] do[es] not exclude it as incompetent for that reason alone." *C.R. Pittman Const. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011). "[C]haracterizing a party's testimony as 'self serving' is not useful to the court. In a lawsuit, where each party is attempting to advance his own cause and protect his own interests, we are scarcely shocked when a party produces evidence or gives testimony that is 'self-serving.'" *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306 (5th Cir. 1989).
>
> **Hearsay**: The broad hearsay objection Plaintiffs assert is too general and vague as it fails to identify what specific part of Sgt. Massey's 10-page declaration allegedly contains hearsay statements. Simply screaming "hearsay" at the top of your lungs without pointing out the alleged hearsay statement is not sufficient. Courts often reject objections to the summary judgment evidence that are too general and this case is no exception. *See Hoffman v. Bailey*, 257 F. Supp. 3d 801, 824 (E.D. La. 2017) ("It is not the Court's responsibility to comb through the record to determine the basis for [defendant's] cursory objections or to make arguments on his behalf"). Even

7

so, I have gone ahead and reviewed every line of the Sgt. Massey declaration. My search has failed to unearth a single hearsay statement.

**Incomplete**: I have no idea what this objection means, and Plaintiffs do not bother to explain, probably because the objection is truly meaningless. If Plaintiffs think any piece of Sgt. Massey's summary judgment evidence fails to tell the whole story, Plaintiffs certainly have the opportunity to present any evidence they want me to consider. In this case, however, Plaintiffs did not attach a single piece of evidence to their opposition brief.

**Unauthenticated**: Huh? Sgt. Massey's declaration is made under the penalty of perjury and he asserts that he has personal knowledge of each and every fact alleged. From an evidentiary standpoint, there is nothing improper about Sgt. Massey's declaration.

Accordingly, Plaintiffs' objections to the Sgt. Massey declaration are overruled.

## ANALYSIS

Now that Sgt. Massey has asserted qualified immunity, the burden rests on Plaintiffs to show that (1) "the officer violated a federal statutory or constitutional right and (2) . . . the unlawfulness of the conduct was clearly established at the time." *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (internal quotation marks and citation omitted). The Supreme Court has expressly given me the discretion to determine which of the two prongs to tackle first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). *See also Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) ("If the plaintiff fails at either step, [a] federal court can grant qualified immunity by addressing either step or both of them."). In this case, I need only focus on the first prong of the qualified immunity analysis. My conclusion: Sgt. Massey did not violate Herrera's constitutional rights.

Claims of excessive force are properly analyzed under the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[*A*]*ll* claims that law enforcement officers

have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."). To prevail on a Section 1983 excessive force claim under the Fourth Amendment, "a plaintiff must establish: (1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) (quoting *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008)). "An officer's use of deadly force is presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009). Because police officers must often make instantaneous decisions in "tense, uncertain, and rapidly evolving" situations, the reasonableness of the use of deadly force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396–97. It is a question of objective reasonableness "in light of the facts and circumstances confronting [the officer], without regard to [the officer's] underlying intent or motivation." *Id.* at 397. *See also Stroik v. Ponseti*, 35 F.3d 155, 158–59 (5th Cir. 1994) ("[W]e must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. . . . What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.") (quotation omitted).

    If there ever was a case that cried out for the application of the qualified immunity doctrine, this is it. In the midst of trying to arrest a violent crime suspect, Sgt. Massey

9

found himself facing a law enforcement officer's worst nightmare. The suspect not only resisted arrest and refused to comply with all commands, but also managed to obtain a deadly weapon (in this case, a knife) with which he threatened Sgt. Massey from an arm's length away. Unable to subdue Herrera using his strength and agility, Sgt. Massey made a split-second decision. To protect his life, he grabbed his gun and shot Herrera three times.

It is easy for someone now, far removed from the 40 seconds of chaos that shattered that calm January 2017 day, to second-guess Sgt. Massey and claim he should not have resorted to deadly force. But the videotape captures the struggle between Sgt. Massey and Herrera, providing irrefutable evidence that Herrera's actions that afternoon posed a serious and continuing threat to Sgt. Massey. If a picture is worth a thousand words, the videotape is worth many more. Any rational, reasonable human being who watches the short videotape will conclude that Sgt. Massey had "probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to [himself] or to others," thus justifying deadly force. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

The Fifth Circuit's decision in *Orr v. Copeland*, is instructive. *See* 844 F.3d 484. In that case, an Austin police officer chased a suspected drug trafficker, grabbed him from behind, and ordered him to put his arms behind his back. *See id.* at 488. The suspect refused and began to fight back. *See id.* In a pattern strikingly similar to the current case before me, the suspect put the officer in a headlock, wrestled the officer to the ground, and repeatedly reached for the officer's firearm. *See id.* Believing his life was in danger, the exhausted officer drew his weapon and fired three shots into the suspect's chest, killing him. *See id.* Although the suspect never gained control of the weapon, the Fifth Circuit

held that the officer was entitled to qualified immunity, noting: "[I]t is objectively reasonable for an officer to use deadly force even if he merely *believes*—albeit reasonably—that the suspect is reaching for a weapon." *Id.* at 494. *See also Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009) (finding that an officer's use of deadly force was not excessive when undisputed evidence showed that the suspect "in defiance of the officers' contrary orders, reached under the seat of his vehicle and appeared to retrieve an object that [the officer] reasonably believed to be a weapon"); *Ontiveros*, 564 F.3d at 385 (finding that an officer acted reasonably when he shot a suspect who had refused to obey orders and reached into his boot for something). Because it was undisputed that the suspect reached for the officer's pistol, the officer's use of lethal force was objectively reasonable.

Here, the facts are even more compelling. Not only did Herrera reach for Sgt. Massey's gun, but he eventually gained control of a deadly weapon (the knife) after Sgt. Massey threw the knife on the street to free a hand in an effort to handcuff the suspect. Weapon in hand, Herrera lunged toward Sgt. Massey, and Sgt. Massey struggled to prevent Herrera from cutting or stabbing him with the knife. In those few, hectic seconds, Sgt. Massey was completely justified in using deadly force to defend himself from harm.

Not surprisingly, it is well-settled that "[a]pproaching, attacking, or threatening police officers with a knife or knives can be the basis for an objectively reasonable determination that a suspect poses a threat of serious physical harm." *Gomez v. City of Pharr*, No. 7:18-cv-342, 2019 WL 448898, at *4 (S.D. Tex. Feb. 5, 2019). In *Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 281–82 (5th Cir. 2019), for example, a law enforcement officer shot an individual who moved toward him from a distance of between

10 to 30 feet while holding a knife, after the officer had told the individual not to approach. In finding that the officer's use of force was neither excessive nor unreasonable under the Fourth Amendment, the Fifth Circuit held: "Under the totality of circumstances present in this case, even if we were to accept that Mr. Shepherd still had the knife at his side at the moment when he was shot, there is ample reason to conclude that he posed a real threat of serious bodily harm to the officer." *Id.* at 284.

There are a litany of other cases establishing that the use of deadly force is not unreasonable when a suspect armed with a knife makes threatening gestures towards an officer. *See City of S.F. v. Sheehan,* 135 S. Ct. 1765, 1775 (2015) ("[P]otentially deadly force was justified" against a woman armed with a knife who threatened officers and, despite warnings and pepper spray, "kept coming at the officers until she was only a few feet from a cornered [o]fficer."); *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012) (holding that an officer did not use excessive force when the individual "ignored repeated instructions to put down the knife, . . . [was] in close proximity to [the officer], and [was] moving closer"); *Rockwell v. Brown*, 664 F.3d 985, 992 (5th Cir. 2011) (holding that the fatal shooting of a mentally-ill man armed with two knives who attacked law enforcement officers was reasonable); *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003) (using deadly force was not objectively unreasonable when a suspect had "brandish[ed] an eighteen to twenty inch sword" and failed to "respond to commands to drop his sword or to stop moving toward the [police] officers"). At its core, this case is another in this long line of authority establishing that an officer is justified in utilizing deadly force when he has an objectively reasonable belief that his life could be in danger.

"[I]f an excessive force claim turns on which of two conflicting stories best captures what happened on the street," the caselaw "will not permit summary judgment in favor of the defendant official. . . . [A] trial must be had." *Saucier v. Katz*, 533 U.S. 194, 216, (2001) (Ginsburg, J. concurring). But, at the same time, "Plaintiffs still have the burden of adducing evidence that contradicts [Sgt. Massey's] description of the shooting." *Shumpert v. City of Tupelo*, 905 F.3d 310, 324 (5th Cir. 2018). As a judge, I must accept Sgt. Massey's testimony as set forth in his declaration unless there is contradictory evidence contained somewhere in the summary judgment record. *See id.* at 315–16 (a court must "review the facts in the light most favorable to [Plaintiffs], but only when both parties have submitted evidence of contradictory facts.") (internal quotation marks, citation, and ellipsis omitted).

In this case, summary judgment is appropriate because Plaintiffs have presented no summary judgment evidence. None. Zero. Zilch. Nada. Although Plaintiffs' opposition brief references three exhibits, none are attached to the brief for my consideration. At oral argument, Plaintiffs indicated that they wanted to submit an audio recording of an eyewitness for the court to consider. Sgt. Massey's counsel kindly agreed to let them do so, but Plaintiffs never bothered to file the audio recording. As a result, there is simply no evidence in the record that contradicts Sgt. Massey's unequivocal testimony that Herrera gained control of his knife and "[t]he force I used was necessary to defend myself from the risks of serious bodily harm Herrera's actions posed." Dkt. 42-2 at 7. Under these circumstances, Massey's use of lethal force was not unreasonable. There is no constitutional violation.

13

Because Plaintiffs have failed to demonstrate a constitutional violation, they have failed to satisfy their burden of showing that Massey is not entitled to qualified immunity. This case should be dismissed.

## CONCLUSION

For the reasons explained above, I **RECOMMEND** that the Motion for Summary Judgment (Dkt. 42) be **GRANTED**.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED at Galveston, Texas, this 26th day of February, 2020.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE